# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

KAREN SPENCER                                                                                    PLAINTIFF

v.                                            Case No. 4:09CV00173 JLH

SALINE COUNTY MEDICAL CENTER,
d/b/a SALINE MEMORIAL HOSPITAL                                              DEFENDANT

## OPINION AND ORDER

Karen Spencer commenced this action against Saline County Medical Center, d/b/a Saline Memorial Hospital, alleging violations of Title VII and the Arkansas Civil Rights Act of 1993 (ACRA). In her complaint, Spencer claims that she was terminated and discriminated against based on her sex, that instances of sexual harassment created a hostile work environment, and that she was terminated in retaliation for complaining of and opposing sexual harassment. The Hospital has moved for summary judgment, and Spencer has responded. For the following reasons, the Hospital's motion for summary judgment is granted.

## I.

A court should enter summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of

material fact.  *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553.  If the moving party meets this burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting FED. R. CIV. P. 56(e)).  A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  In deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all inferences in his favor, mindful that summary judgment seldom should be granted in discrimination cases where claims are often based on inferences.  *Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000) (collecting cases).  *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J., dissenting).

## II.

The following material facts are undisputed.  The Saline County Medical Center, d/b/a Saline Memorial Hospital, is a medical facility located in Saline County, Arkansas.  The plaintiff, Karen Spencer, began working for the Hospital in the housekeeping department on November 20, 2006.  Spencer's duties included cleaning patient rooms and other hospital areas.  Her direct supervisor was Kathleen Blackwell.

At the time of her hiring, Spencer went through the Hospital's orientation process, which included a handout and PowerPoint presentation.  The orientation covered Hospital policies on sexual harassment, attendance, and grievance processes.  The sexual harassment policy advises employees to report immediately instances of harassment to their supervisor or Vice President for Human Resources.  Although not required to do so, employees are encouraged to report concerns

within ten days to facilitate investigations. Employees can raise concerns without fear of reprisal or retaliation. The attendance policy distinguishes between scheduled and unscheduled time-off, but does not distinguish between excused and unexcused absences. When Spencer started, the policy allowed up to seven unscheduled absences within a twelve-month period.[1] Each unscheduled absence was considered an "occurrence."

On February 27, 2007, Spencer received disciplinary action in the form of a written counseling notice for having accumulated 3 occurrences. She was reminded that if she accumulated 5 occurrences within the next 12 months, she would be terminated. Spencer and her supervisor, Kathleen Blackwell, signed and dated the notice.

On December 6, 2007, Spencer received another written notice, this time for having accumulated 3.5 occurrences since March 26. Again, she was counseled that if she accumulated 5 occurrences prior to May 10, 2008, she would be terminated. Spencer signed and dated the written counseling notice.[2] Spencer received yet another written notice that same day for calling in sick, which put her total number of occurrences at 4.5.

On May 10, 2008, occurrences that occurred prior to May 10, 2007, "rolled off" Spencer's attendance records. When Burns was hired in March 2007, he could not determine exactly how

---

[1]The Hospital says that the policy was later revised to state that five unscheduled absences within a twelve-month period would result in an employee's discharge. Spencer says that Randy Fortner told her that the accrual of absences would be within the discretion of each supervisor, and that her supervisor, Robert Burns, told her that her absences would be "zeroed out" in May 2008.

[2]Spencer's supervisor at this time was Burns, whom the Hospital had hired on March 26, 2007, as one of the supervisors for the housekeeping department. Although she signed the notice, Spencer again contends that at the time of her termination the Hospital's policy was to give each supervisor discretion in tallying occurrences, and that Burns had said her absences would be zeroed out in May 2008.

many occurrences each employee had accumulated, so he decided that everyone would start with a clean slate beginning May 10, 2007. After May 10, 2008, Spencer received a 0.5 reduction in her accumulated occurrences. On May 25, 2008, she called in sick with a toothache, and on May 28 she took another unscheduled absence. She was late for work on June 3, and took an unscheduled absence on June 11. At that point, the Hospital says that Spencer had accumulated 7.5 occurrences, which was the reason for her termination. Spencer says that Burns told her that her number of occurrences would start over at zero beginning May 10, 2008, and that she would have reported to work in May and June had she known that additional occurrences would result in termination.

Spencer was terminated on June 12, 2008. On August 7, 2008, she filed an EEOC charge of discrimination, alleging sex discrimination and retaliation. After receiving notice of her right to sue, she commenced this action. She alleges that she endured several instances of sexual harassment by Burns from October 2007 through December 2007, making her workplace a hostile work environment. She refused his sexual advances. She says she attempted to complain to the Hospital's CEO but was not allowed to speak to him, and that after Burns became aware of her attempt he told her that she should not try to complain again. Spencer says she was terminated in retaliation for rejecting Burns's sexual overtures.

### III.

Spencer's complaint alleges that instances of sexual harassment created a hostile work environment; that Burns retaliated against her because she opposed and complained of sexual harassment; and that she was discriminated against because of her sex.

#### A.    HOSTILE WORK ENVIRONMENT

Title VII prohibits discrimination based on sex. A plaintiff establishes a prima facie case of

hostile work environment by showing that (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of her employment. *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004) (citing *Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002)). Spencer, as a female, is a member of a protected group under Title VII. The Hospital appears to concede that Burns subjected her to some level of unwelcome harassment based on her sex. However, the Hospital argues that Spencer cannot show that Burns's conduct was so severe or pervasive as to affect a term, condition, or privilege of her employment.

To establish the fourth element, a plaintiff must make a high evidentiary showing that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)). The plaintiff must show that the victim actually perceived the environment as abusive *and* that a reasonable person would find the environment to be hostile. *Duncan*, 300 F.3d at 934. To determine whether the harassment was sufficiently severe or pervasive, a court considers the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23, 114 S. Ct. at 371). These high standards are meant to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," as the purpose of Title VII is not to "purge the workplace of vulgarity." *Id.* (quoting

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998);

*Bakerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

Spencer's hostile work environment claim is based on the following allegations of sexual harassment:

1. In May or June 2007, Burns gave Spencer a music CD about two months after he was hired, and she thought that was strange. She believed one song was inappropriate because it spoke of dancing in the rain, being in love, and making love. After seeing a tattoo of the music band Rolling Stones on her arm, Burns told her that if she liked the Rolling Stones she would like the CD. Burns gave her other CDs as well.

2. Burns told Spencer that he hung out at the Veterans of Foreign Wars (VFW) building in Benton, Arkansas, and on at least two occasions invited her along. She did not go.

3. Burns told Spencer that he and his wife might have her over for dinner with other guests. She thought it was "like a dinner party thing." She did not attend the dinner.

4. Burns told her drinking stories from his time in Scotland. In one of these stories, Burns told her that he once tried to obtain free beer from a vending machine by urinating in the coin slot, was electrocuted, but "was fine in that area now."

5. After hand surgery, Burns said he was on so many pain pills that his wife was complaining about his intimate performance. Spencer responded, "Well, I can understand that," and Burns said, "Well, it wouldn't be like that if it were you."

6. In May or June 2007, Spencer mentioned to a group of people that she had considered going skydiving for her upcoming birthday. Burns, who was in the group, later called her to his office and asked if she was serious. He said she would enjoy it and that it was better than sex.

7. Burns asked Spencer if she had a passport and how long it would take her to obtain one. He was going to Scotland, but his wife was unable to go so he had an extra ticket. He also said he had tickets to a concert. She told him the concert would be "awesome," but that she could not see herself flying that far, did not have a passport, and could not take off that amount of time from

work.  Spencer says she may have ended the conversation by asking Burns to bring back pictures.

8.  Seeing a picture in his office, Spencer commented that Burns had a nice looking family.  Burns sent his brother an email discussing Spencer.  Burns told his brother that Spencer thought that he was cute, and Spencer took the email exchange to be an attempt to set them up on a blind date.  Spencer testified that this email was "not offensive so much as bizarre."  Burns showed Spencer the email in the fall of 2007.

9.  In February 2008, Burns gave Spencer an envelope and told her to open it later.  During a work break, Spencer asked her coworker Melissa Magnum to read what was inside since she did not have her glasses.  It was an email[3] from Burns to his brother reminding him of Spencer.  Burns said that Spencer had recently visited the doctor but that "he didn't know if it was pyorrhea, diarrhea, or gonorrhea that they determined it to be."  The email also said that Spencer was attractive.  After stating that African American men have a reputation for being well-endowed, the email said "she hasn't seen a Scottish one yet."

Within a couple minutes after having opened the envelope, Burns called Spencer and asked what she thought about it.  She told him that she was "pissed off and that [she] didn't have gonorrhea, diarrhea, or pyorrhea, and that [she] didn't appreciate it."  Burns laughed, saying he did not really send the email and that it was all a joke.

Spencer testified that another employee, Normalene Cobb, said that she was not comfortable with Burns referring to other women as "love."  Spencer also testified that Burns would place his hand on her shoulder when talking to her, that she felt like he was being sexual, and that "he had intentions."

The Hospital argues that the alleged instances of sexual harassment were not so severe or pervasive as to affect a term, condition, or privilege of Spencer's employment.  In support, the Hospital cites the Court to several cases in which the Eighth Circuit has held that the alleged conduct

---

[3]Neither of the two emails have been submitted as evidence, so the only evidence of the emails' content is Spencer's deposition testimony.  Spencer says the copy of the second email was stolen from her cleaning cart.

was not sufficiently severe or pervasive: *Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858, 860-61 (8th Cir. 2009) (manager rubbed plaintiff's shoulders and back during her training sessions, told her how far she went in the company was up to him, called her "baby doll," called her while on vacation and said she should be in bed with him and a Mai Tai, and told her that she did not want to be "one of [his] girls") ; *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1025 (8th Cir. 2004) (manager asked plaintiff out every day for the first few weeks, called her at home late at night to invite her to a concert, and criticized her and changed her schedule after she rejected his advances); *Duncan v. General Motors Corp.*, 300 F.3d 928, 933-34 (8th Cir. 2002) (supervisor propositioned plaintiff for a "relationship," touched her hand, requested that she sketch a phallic-shaped planter, displayed a poster for the "Man Hater's Club", and requested that plaintiff type the "He-Men Women Haters Club" beliefs, which were derogatory towards women); and *Scusa v. Nestle USA Co., Inc.*, 181 F.3d 958, 961-62 (8th Cir. 1999) (coworker patted plaintiff on the bottom, blew her kisses, and made sexual comments toward her; another coworker made threatening gestures and yelled obscenities at her; plant manager slammed his fist on the table during meeting to discuss plaintiff's sexual harassment claims and yelled "you f----- girls better get your stories straight").

Spencer counters that other Eighth Circuit cases have held there to be a genuine issue of material fact under circumstances similar to or less severe than this case, citing the following: *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888-89 (8th Cir. 1998) (supervisor inappropriately touched plaintiff or caused her to touch him on at least five occasions over the course of four months); *Rorie v. United Parcel Service*, 151 F.3d 757 (8th Cir. 1998); and *Hathaway v. Runyon*, 132 F.3d 1214, 1217 (8th Cir. 1997) (coworker touched plaintiff in sexually suggestive manner after having expressed a sexual interest in her, and he and his friend laughed, snickered, and made

suggestive noises at plaintiff for a period of eight months).

In this case, the alleged instances of sexual harassment are less egregious than the harassment that occurred in *Anderson*, *Henthorn*, *Duncan*, and *Scusa*, in which the Eighth Circuit held as a matter of law that the harassment was insufficiently severe to create a hostile work environment.

The cases relied on by Spencer are distinguishable and unavailing. In *Phillips*, the Eighth Circuit reversed the district court's grant of summary judgment based on the fact that the employer took prompt remedial action reasonably calculated to end the harassment. In granting summary judgment, the district court did not discuss whether the supervisor's actions were sufficiently severe or pervasive. Rather, the district court granted summary judgment because the employer had taken prompt remedial action. *Phillips*, 989 F. Supp.1021, 1024 (E.D. Mo. 1997). On appeal, the Eighth Circuit noted that the United States Supreme Court had announced a new rule: where no tangible employment action is taken, an employer may raise an affirmative defense to liability or damages by showing (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Faragher*, 524 U.S. at 807, 118 S. Ct. at 2293. In that context, the Eighth Circuit held:

> The record here discloses that [the supervisor] inappropriately touched [the plaintiff] or caused her to touch him on at least five occasions from March 1995 to June 18, 1995. [The plaintiff] found these incidents humiliating and [the supervisor's] behavior made it difficult for [the plaintiff] to perform her job duties. Since there is sufficient evidence of improper conduct and [the plaintiff's] subjective reaction, all that remains is the issue of whether [the plaintiff] has shown that the offending conduct created an objectively hostile environment. Under the facts of this case, this is a question best left to the fact-finder.

*Phillips*, 156 F.3d at 888-89 (internal citations omitted). The Eighth Circuit provided no analysis

as to how or why the alleged inappropriate physical touching amounted to a hostile work environment, and neither the Eighth Circuit nor the district court provided details of the alleged inappropriate physical touching. The Eighth Circuit simply remanded the case for the district court to apply the new affirmative defense set out in *Faragher*, "[a]ssuming [the plaintiff] can show an actionable hostile environment claim." *Id.* at 889.

Thus, *Phillips* really centers on a different issue from whether certain actions are sufficiently severe or pervasive. Even if *Phillips* was relevant to whether Burns's harassment was severe or pervasive, *Phillips* involved multiple instances of inappropriate touching. Here, Spencer's case of sexual harassment relies primarily on Burns's statements and emails, not on multiple instances of touching. The only physical touching alleged here is that Burns would place his hand on Spencer's shoulder while talking to her. When asked in deposition testimony whether she thought the touching was sexual, she responded: "Kind of, but I didn't know . . . ."

*Hathaway* involved an appeal from a judgment as a matter of law granted in favor of the employer after a jury had awarded the plaintiff compensatory damages for sexual harassment.[4] There, the Eighth Circuit held that the following evidence was sufficient to support the jury's finding that the plaintiff was subjected to a hostile work environment:

[The plaintiff] was physically touched in a sexually suggestive and intimate manner

---

[4]That *Hathaway* involved review of a judgment as a matter of law does not distinguish it from cases reviewing a grant of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) ("[The summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.").

on two occasions[5] by a coworker who had expressed a sexual interest in her. After she rebuffed his advances, [the coworker] and his friend [] proceeded to laugh, snicker, and make suggestive noises at her for a period of eight months. This treatment frightened and intimidated [the plaintiff.] She feared that [the coworker] would fondle her again or undermine her work performance which he and [his friend] did by wrongly reporting her for mislabeling mail. She testified that she was terrified to pass within grabbing range of either [the coworker or his friend] and that she felt trapped when they blocked her exit from the narrow label room. The jury heard [the plaintiff] reproduce the noises that disturbed her, and it credited her position that this pattern of behavior created a hostile work environment related to [the coworker's] earlier advances.

*Hathaway*, 132 F.3d at 1222. Again, the conduct complained of in *Hathaway* is distinguishable from this case. Spencer was not touched other than on her shoulder, nor was she the object of repeated intimidation and ridicule. There is no evidence that Spencer worked in constant fear of being groped or fondled, or that she feared passing within grabbing range of Burns.

In *Rorie*, the plaintiff's supervisor commented about her smelling good, patted her on the back, and brushed up against her often. His conduct continued throughout her employment of about nine months. He called her at home and asked if she would like to go swimming and whether she heard rumors about a coworker's penis size. During that same conversation, he said that she looked better in a UPS uniform than another female employee. The Eighth Circuit said that the facts of that case were "on the borderline of those sufficient to support a claim of sexual harassment," but that "we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law." *Rorie*, 151 F.3d at 762. The Eighth Circuit reversed the district court's grant of summary judgment.

---

[5]The coworker first hit her on the buttocks with a clipboard while they were together in an enclosed stairwell. One week later, he approached her from behind and squeezed her buttocks while she was waiting for an elevator. After the first occasion, the plaintiff gave him a disapproving look; after the second, she told him not to touch her again because it made her feel uncomfortable and she did not like it. *Hathaway*, 132 F.3d at 1217.

As in *Phillips*, however, the *Rorie* court's remand was in the immediate wake of the newly developed affirmative defense as set out in *Faragher*, a defense which the district court had not yet had occasion to apply. *Rorie*, 151 F.3d at 762. The conduct in *Rorie*, which was "on borderline of those sufficient to support a sexual harassment claim," is objectively more severe than the conduct complained of by Spencer.

Burns's conduct, as described by Spencer, was immature, inappropriate, and in some instances crude, but it was not such severe harassment, according to the Eighth Circuit cases, to subject Spencer to an objectively hostile work environment. *See Duncan*, 300 F.3d at 935 (although the supervisor's actions were "boorish, chauvinistic, and decidedly immature," they did not create an objectively hostile work environment permeated with sexual harassment).

**B.     RETALIATION**

Spencer also makes a claim for retaliation, alleging that she was terminated in retaliation for having rejected Burns's sexual advances. To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the protected conduct and the materially adverse action were causally linked. *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant does so, the burden then shifts back to the plaintiff to show that the articulated reason is mere pretext for retaliation. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1147-48 (8th Cir. 2008).

**1.     Prima Facie Case**

The Hospital says that Spencer did not complain to Burns, Human Resources, or anyone in

management about Burns's conduct. Because she did not complain, the Hospital argues that there is no protected activity in which she engaged that could be causally linked to a materially adverse action. Spencer counters that rejecting Burns's sexual advances was a protected activity. Spencer cites the Court to *McDonnell v. Cisneros*, 84 F.3d 256 (7th Cir. 1996), for the proposition that refusing sexual advances is a form of passive resistance to discrimination, making it a protected activity.

*Cisneros* is not directly on point with this case. There, a supervisor failed to carry out his employer's desire that he prevent subordinates from filing discrimination complaints. The Seventh Circuit characterized the supervisor's conduct as "passive resistance" that constituted a protected activity. *Cisneros*, 84 F.3d at 262. Here, Spencer did not "passively resist" an employer directive to prevent others from complaining of discrimination. Rather, she did not accept some of Burns's social invitations. Although her actions were passive in nature, they cannot be characterized as "passive resistance" to an employer scheme aimed at preventing discrimination complaints.

Other than sharing Burns's emails with Melissa Magnum, her coworker, Spencer did not complain to Burns or anyone else about the alleged instances of harassment. According to her own testimony, the only time Spencer expressed any disapproval to Burns was in connection with the second email containing references to her medical diagnoses. In response to that email, Spencer told Burns that she was "pissed off" and that she did not have any of the diseases he mentioned. In February 2008, Spencer says she attempted to complain to Randy Fortner, the Hospital's CEO, about Burns's conduct. She went to Fortner's office and asked to meet with him. Fortner's administrative assistant asked for purpose of the meeting, and Spencer said she wanted to discuss whether the housekeeping employees would receive raises for the extra duties recently imposed on them.

Spencer did not mention the alleged harassment.  Fortner's assistant said he was unavailable at that time and asked if Spencer wanted to make an appointment.  Spencer said she did not.  Upon returning from Fortner's office, Burns told Spencer that they needed to talk and brought her to the office of Joe Steele, another supervisor.  Steele asked her whether she had just been to Human Resources.  She said yes, and he asked what it was about.  She told him what she had said to Fortner's assistant.  Spencer did not tell Steele or Burns that she was attempting to complain to Fortner about Burns's conduct.

Spencer's EEOC charge alleges that she was discharged "in retaliation for rejecting sexual advances and attempting to complain about the harassment."  Her complaint alleges that the Hospital terminated her "in retaliation for opposing and complaining of sexual harassment."  Other than inviting Spencer to the VFW and on a trip to Scotland (invitations that contained no sexual references), the evidence does not support a showing that Burns actually made a sexual advance on Spencer.  Even if he did, and even if the advance were rebuffed, there is no evidence that Spencer opposed or complained of sexual harassment.  There is no evidence that Spencer complained to anyone at the Hospital, or that she told Burns that she was uncomfortable with his advances or thought his behavior to constitute harassment.  Although she may have "attempted to complain" to the Hospital CEO, she did not present Fortner's assistant with the alleged real reason for her office visit, and there is no evidence that Fortner's office prevented her from complaining about sexual harassment in the future.  Therefore, because she did complain about Burns's conduct, she cannot make out a prima facie case of retaliation.

## 2.    Pretext

Even if Spencer could make out a prima face case of retaliation, she cannot show that the

Hospital's legitimate, nondiscriminatory reason for her discharge was mere pretext. See *Van Horn*, 526 F.3d at 1147-48 (after the employer presents a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the employee to show that the reason is mere pretext for retaliation).

The Hospital says that Spencer was discharged because she had accumulated more than 5 occurrences, or unscheduled absences, within a 12 month period, which required her termination under Hospital policy. Spencer was educated during the orientation process on the Hospital's policy on unscheduled absences. On February 27, 2007, she signed and dated a written counseling notice for having accumulated 3 occurrences, in which she recognized that she was aware that if she accumulated 5 occurrences within the next 12 months, she would be terminated. On December 6, 2007, she signed and dated another written notice for having received 3.5 occurrences since March 26. She again acknowledged that if she accumulated 5 occurrences before May 10, 2008, she would be terminated. She called in sick that same day, putting her number of occurrences at 4.5. After May 10, 2008, she received a 0.5 reduction for unscheduled absences occurring prior to May 10, 2007. She then took unscheduled absences on May 25, May 28, June 3, and June 11, bringing her number of occurrences to 7.5. Burns reported Spencer's number of occurrences. On June 12, 2008, Spencer received a written notice of termination, signed by Burns and Francine Del Giacco, Human Resource's Administrative Representative.

In response, Spencer says that Burns told her that her occurrences would "zero out" in May 2008. After she took more unscheduled absences in May and June 2008, Spencer says she called Burns and asked whether she would lose her job because of the unscheduled absences, and Burns told her that she would not. Spencer has also submitted an affidavit in which she states that Del

Giacco has admitted that Burns was responsible for keeping track of attendance and for doing "stepped disciplinary actions." Spencer gives six reasons why the Hospital's explanation is mere pretext.

First, Spencer says that she has provided "ample evidence of discriminatory intent based on gender and retaliation." In support, Spencer cites to *Graves v. Ark. Dep't of Fin. and Admin.*, 229 F.3d 721 (8th Cir. 2000). That case has no bearing on the assertion for which Spencer cites it. There, the Eighth Circuit held that it could be inferred from the evidence that the plaintiff—who alleged a violation of his First Amendment right to free speech—was really terminated because he had filed an internal grievance against his supervisor, whom the department subsequently investigated. Here, Spencer makes no First Amendment claim, and she never filed an official grievance with the Hospital. If anything, *Graves* is unhelpful to Spencer's overall case, since the Eighth Circuit also held that the plaintiff failed to establish harassment or a hostile work environment, noting that the plaintiff had submitted only a conclusory affidavit to support his claim. *Graves*, 229 F.3d at 723.

Second, Spencer says that she would not have been terminated but for Burns reporting her number of occurrences, and since he influenced or controlled the decision to terminate her, there exists an inference of retaliation. In support, Spencer cites to *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998). Like *Graves*, *Quinn* is not on point. The Second Circuit held there was an issue of fact on retaliatory discharge where (1) there was a strong temporal connection between the plaintiff's discharge and her complaints to the company and the New York Division of Human Rights and (2) nearly all of the evidence supporting the company's articulated reason was generated by the two alleged harassers. In this case, however, Spencer did not complain to the Hospital, to an

Arkansas department on human rights, or to anyone else, nor is there a strong temporal connection between the alleged sexual advances and her termination. Furthermore, although Burns played a part in reporting the number of Spencer's occurrences, Spencer does not dispute that she actually took the unscheduled absences in question—she only disputes how those absences are tallied, having previously signed written notices acknowledging that more than 5 occurrences within 12 months would result in termination.

Third, Spencer says that other similarly situated employees in the same department and under the same supervisors accumulated as many or more occurrences as Spencer, yet received more lenient punishment. Instances of disparate treatment can support a claim of pretext, but Spencer bears the burden of showing that the other employees were "similarly situated in all relevant respects." *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (quoting *Jones v. Frank*, 973 F.2d 673, 676 (8th Cir. 1992)). Whether employees are similarly situated depends on the nature of the employment relationships, the relevant decision makers, and the nature of the employees' misconduct. *See Wallin v. Minn. Dep't of Corrections*, 153 F.3d 681, 687 (8th Cir. 1998); *Anheuser-Busch*, 38 F.3d at 972.

In her deposition testimony, Spencer identified only Rhonda Dedrick, Chris Kidd, and Lawrence Fagan as similarly situated comparators. In response to the Hospital's motion for summary judgment, Spencer submitted evidence of unscheduled absences taken by the following employees: Dedrick, Kidd, Angela Culpepper, Amanda Long, Noble Rollans, Christina Sandoval, and Lori Whitney. Kidd received a written counseling notice for accumulating 4.5 occurrences, and his other unscheduled absences were a result of an on-the-job injury that did not constitute an "occurrence" under Hospital policy. Spencer testified that Dedrick was suspended and terminated

for her absences. Spencer says that "[a]ll these employees were in the same department, under the same supervisors, and the ultimate decision-makers for termination would have been the same." Other than conclusory allegations, speculation, and submitting a series of "payroll adjustments" for the proposed comparators, Spencer has not presented evidence showing that these other employees are similarly situated in all relevant aspects.

Fourth, Spencer and Magnum have testified that the Hospital's attendance policies were not generally enforced "if you were in good with the employer and that people were not referred to [Human Resources] for termination for having 5 or more points." Spencer cites to *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018 (8th Cir. 1998), for the proposition that failure to use normal procedures is a basis for showing pretext. Again, Spencer cites the Court to a case that is not on point. There, the Eighth Circuit held that the fact that the employer failed to follow its own policy manual, coupled with its mischaracterization of the plaintiff's absence due to a court subpoena as one for "legal incarceration," "lend[ed] support to an inference of improper motive." *Young*, 152 F.3d at 1024. Here, there is no evidence that the Hospital failed to follow its policy manual regarding termination for absences. Rather, Spencer's complaint is based on allegations that the Hospital strictly followed its absenteeism policy in terminating her, but that it should not have done so. Nor is there evidence that the Hospital has mischaracterized the reasons for Spencer's absences "in a manner giving rise to negative connotations." *See id*.

Fifth, Spencer says that she "testified as to closer supervision, which is evidence of pretext." In support, she cites to *Hossaini v. Western Missouri Med. Ctr.*, 97 F.3d 1085 (8th Cir. 1996). Although that case discusses evidence of pretext, at no point does the court discuss closer supervision of the plaintiff, much less hold that closer supervision was sufficient to establish pretext.

*See Hossaini*, 97 F.3d at 1089-90.

Finally, Spencer says that shifting explanations and false statements are evidence of pretext, citing to *Edwards v. United States Postal Service*, 909 F.2d 320 (8th Cir. 1990) (involving a claim for failure to transfer or promote), and *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018 (8th Cir. 1998). In both of those cases, the employer initially gave the employee one reason for the adverse action, and later articulated a different reason. *See Young*, 152 F.3d at 1024 ("When an employer has offered different explanations for an adverse employment action . . ., the trier of fact may reasonably infer that the employer is hiding something—that is, that the true explanation is unlawful discrimination."); *Edwards*, 909 F.2d at 323-24 ("changing and inconsistent explanations" for the adverse action constituted pretext). Spencer alleges that the Hospital and Burns now deny that Burns said that her occurrences would zero out and that she would not be punished. However, those are not "changing and inconsistent explanations" for her termination. The Hospital's reason for terminating Spencer is the same now as it was when she was first terminated: she accumulated more than 5 occurrences in violation of the Hospital's attendance policy. Although Spencer takes issue with how those occurrences were tallied, the Hospital has neither shifted its explanation for nor given false statements regarding the reason for Spencer's termination.

In summary, none of Spencer's proffered six reasons are sufficient to show that the Hospital's legitimate, nondiscriminatory reason for her termination is mere pretext for retaliation. Spencer did not complain to Burns or anyone in Hospital management about Burns's behavior, so there is no activity for which she could have been retaliated against. Even if Spencer's self-serving affidavit and deposition testimony about Burns having discretion and zeroing out her occurrences were sufficient to show that the Hospital's explanation is false or incorrect, she still has not presented

evidence that the explanation is a pretext for retaliation. *See Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 870 (8th Cir. 2009) ("'[P]retext' . . . often must be read as shorthand for indicating that a defendant's proffered . . . explanation . . . is a pretext for *unlawful discrimination*, not that it is merely false in some way.") (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005)); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 777 (8th Cir. 1995) ("[P]roof that the defendant's articulated explanation is false or incorrect does not, standing alone, entitle the plaintiff to judgment; instead, the showing must be that the explanation is a pretext *for* discrimination.").

## C.    SEX DISCRIMINATION

Count I of Spencer's complaint is titled "Gender Discrimination and Retaliation." Spencer's complaint alleges only that the Hospital "terminat[ed] her based on her gender," and otherwise makes no allegations of sex discrimination or its necessary elements. The complaint alleges no facts to support the assertion that Burns or the Hospital terminated Spencer because she is a woman. Rather, the gist of the allegations is that she was terminated as an extension of Burns's sexual harassment and in retaliation for opposing and complaining of the harassment. To the extent that the complaint does state a claim for sex discrimination, that claim fails under a summary judgment analysis.

To establish a prima facie case of sex discrimination, a plaintiff must show that (1) she was a member of a protected class, (2) she was qualified or meeting her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of the class were treated differently or there are facts giving rise to an inference of sex discrimination. *Shaffer v. Potter*, 499 F.3d 900, 904-05 (8th Cir. 2007); *Devin v.*

*Schwan's Home Service, Inc.*, 491 F.3d 778 (8th Cir. 2007). The Court has already discussed the comparators that Spencer offered to establish pretext for retaliation. Spencer does not offer evidence that she was treated differently than other male employees, as Spencer's proffered comparators include both men and women. Spencer's complaint alleges no facts giving rise to an inference of sex discrimination, and she has provided no evidence to support a showing that she was terminated because she is a woman. Thus, the evidence in this case is insufficient to establish a prima facie case of sex discrimination, assuming that the complaint properly alleged that claim.

Even if Spencer established a prima facie case, she still must prove that the Hospital's legitimate, nondiscriminatory reason for her termination is mere pretext for sex discrimination. *See Beaden v. Int'l Paper Co.*, 529 F.3d 828, 831-32 (8th Cir. 2008). In analyzing Spencer's retaliation claim, the Court discussed at length the reasons why Spencer failed to show that the Hospital's articulated reasons were mere pretext. For all the same reasons, Spencer cannot show that the Hospital's stated reason for terminating her—that she exceeded the allowed number of unscheduled absences—was mere pretext for sex discrimination.

## CONCLUSION

For the foregoing reasons, the Hospital's motion for summary judgment is GRANTED. Document #14. Spencer's claims against the Saline County Medical Center, d/b/a Saline Memorial Hospital, are dismissed with prejudice.

IT IS SO ORDERED this 5th day of February, 2010.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE